# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| CRYSTAL GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-0846-CV-W-NKL |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Crystal Green ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits and Supplemental Security income under the Social Security Act ("August 18, 2009"), 42 U.S.C. §§ 401, *et seq*, and 1381 *et seq*. On June 16, 2008, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Plaintiff's petition.

1

## I.  Factual Background[1]

Plaintiff alleged disability beginning November 29, 2005, based on "depression post traumatic stress personality disorder."  At the time of her alleged onset of disability, Plaintiff was 24 years of age.  She had a twelfth-grade education with special education classes, and past relevant work (PRW) as a cashier.

A review of the records predating her alleged onset of disability indicates that Plaintiff has  mental and psychological limitations.  On October 27, 1987, Plaintiff took the Wechsler Intelligence Scale for Children-Revised (WISC-R) as part of a Clinton School District ("school district") diagnostic evaluation.  Her test results showed that her verbal intelligence quotient (IQ) was 73, her performance IQ was 58, and her full scale IQ was 64.  On November 3, 1993, Plaintiff took the Wechsler Intelligence Scale for Children Third Edition (WISC-III).  Her test results showed that her verbal IQ was 56, her performance IQ was 64, and her full scale IQ was 56.  On November 20, 1996, Plaintiff again took the WISC-III.  Her test results showed that her verbal IQ was 59, her performance IQ was 65, and her full scale IQ was 59.  A school district Notice of Action form dated November 19, 1996, reveals that the school district proposed changing Plaintiff's "educational diagnosis" from "learning disabled" to "mild mentally handicapped."  An undated school district Notice of Action form reveals that Plaintiff wanted to graduate high school as opposed to continuing to receive

---

[1]  Portions of the parties' briefs are adopted without quotation designated.

services from the school district until she was 21 years of age because she had accumulated the necessary credits for graduation.

On October 4, 2002, February 13, 2003, July 24, 2003, and September 23, 2004, Plaintiff presented to Brian K. Bellamy, M.D., with complaints of feeling anxious, lethargic, and "stressed out," and reporting that she was having trouble sleeping and controlling her anger towards her children. Dr. Bellamy assessed anxiety, recommended Paxil and Vistaril, and discussed with Plaintiff ways that she could better cope with her anxiety.

On January 27, 2005, Plaintiff presented to Pathways Community Behavioral Healthcare ("Pathways") for parenting classes and for an alcohol and drug abuse assessment at the request of the Department of Family Services (DFS). Plaintiff told Christie Farrell, B.S., that she had lost custody of her children because one of her children had been scalded by hot water. She also reported that she was having difficulty sleeping and that she needed help with feeling sad, tense, depressed, and agitated/nervous. Plaintiff appeared cognitive, alert, and oriented; her hygiene, grooming, attention, and concentration were good; her thought processes appeared coherent and goal-directed; her speech was regular in rate, rhythm, and volume; her memory and intelligence appeared within normal range; she actively participated in the session; she demonstrated no difficulty following conversation; and she reported no delusions, or suicidal or homicidal ideation. Plaintiff was assigned a Global Assessment of Functioning (GAF) score between 51 and 53.[2]

---

[2]The GAF scale represents a clinician's judgment of an individual's overall level of functioning. It is to be rated with respect to psychological, social, and occupational functioning,

On February 3, 2005, and February 17, 2005, Plaintiff returned to Ms. Farrell for psychotherapy. Plaintiff appeared cognitively alert and oriented; her memory and intelligence appeared within normal range; her thought processes appeared coherent and goal directed; her attention and concentration were good; she actively participated in the session; she demonstrated no difficulty following conversation; her speech was regular in rate, rhythm, and volume; and she reported no delusions, or suicidal or homicidal ideation.

Meanwhile, during group therapy on February 7, 2005, Plaintiff disclosed superficially and verbalized unwillingness to make changes; however, she listened to others, actively participated, and supported her peers' challenges of information and concepts. During group therapy on February 21, 2005, Plaintiff appeared defensive and closed to new ideas, but she actively participated in the group and listened to others.

On February 28, 2005, Plaintiff returned to Ms. Farrell. Plaintiff appeared cognitively alert and oriented; her memory and intelligence appeared within normal range; her thought processes appeared coherent and goal directed; her attention and concentration were good; she actively participated in the session; she demonstrated no difficulty following conversation; her speech was regular in rate, rhythm, and volume; and she reported no delusions or suicidal or homicidal ideation. That same day, in group therapy, Plaintiff

---

and should not include physical or environmental limitations. A GAF score of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficultly in social, occupation, or school functioning (e.g., few friends, conflicts with peers or coworkers). *See Diagnostic and Statistical Manual of Mental Disorders,* 32, 34 (4th ed. text revised 2000) (DSM-IV-TR).

4

appeared defensive at times, but she actively participated in the group, asked good questions, and acknowledged feedback from her peers. Ms. Farrell wrote in a treatment planning form that Plaintiff was progressing in improving her judgment, remaining abstinent from substances of abuse, and meeting DFS's requirements for reunification with her children. During group therapy on March 7, 2005, Plaintiff actively participated in group process, listened to others, asked good questions, disclosed appropriately related material, provided feedback to peers, and interacted well in the group.

On March 9, 2005, Plaintiff returned to Ms. Farrell. She reported that she was feeling frustrated because DFS informed her that she would not be reunited with her children if she continued her relationship with her significant other. (Tr. 310). Although she appeared emotional and was tearful, Plaintiff appeared cognitively alert and oriented, her attention and concentration were good, her thought process appeared coherent and goal directed, her memory and intelligence appeared within normal range, and she reported no delusions, or suicidal or homicidal ideation.

During follow-up with Ms. Farrell on March 14, 2005, Plaintiff appeared moody, depressed, "melancholy," maladapted, manipulative, and anti-social. She expressed frustration with DFS, and she was resistant to identifying ways she and her significant other could work with DFS to be reunited with her children. During group therapy on March 21, 2005, Plaintiff actively participated, listened to others, shared personal experiences about her childhood, and interacted well in the group.

5

On March 28, 2005, Plaintiff returned to Ms. Farrell. She appeared emotional and tearful, but also appeared cognitively alert and oriented, her thought processes appeared coherent and goal directed, her attention and concentration were good, her memory and intelligence appeared within normal range, and she demonstrated no difficulty following conversation.

On March 28, 2005, Plaintiff also attended group therapy. She listened to others, participated actively in group process, and interacted well in the group. During group therapy on April 4, 2005, Plaintiff "vented" about meeting others' expectations, but actively participated in the group, asked questions, and interacted well. During group therapy on April 11, 2005, Plaintiff blamed others and would not verbalize acceptance of her responsibility to make changes. On April 18, 2005, she disclosed superficially, but participated, interacted well, listened to others, and provided feedback to peers.

On April 19, 2005, Plaintiff returned to Ms. Farrell. She appeared cognitively alert and oriented, her attention and concentration were good, and her speech was regular in rate, rhythm, and volume. Although her mood and affect appeared exaggerated, Plaintiff's memory and intelligence appeared within normal range, she demonstrated no difficulty following the conversation, and she participated actively in the session.

On May 18, 2005, May 25, 2005, May 27, 2005, and May 30, 2005, Plaintiff presented to A. Michael Salinger, M.A., for psychological evaluation pursuant to a request from DFS. Plaintiff reported that she had been a special education student in middle school and high school, and graduated one year late, but that she had not repeated any grades, and

6

that she had related well to her teachers and peers. Plaintiff reported that she worked as a waitress in 2004 and 2005, but left her job because of conflicts with supervisors and employees. She also reported that she had once earned a temporary certified medical assistant certificate, but let it expire because she could not afford to renew it. Plaintiff denied past mental health treatment and reported no difficulty understanding conversational speech or the psychological evaluation testing materials. She also denied symptoms of anxiety and depression, which Mr. Salinger noted was inconsistent with information that she had provided over the course of the evaluation. Mr. Salinger administered the Wechsler Adult Intelligence Scale Third Edition (WAIS-III), and the Kaufman Functional Academic Skills Test (K-FAST). Plaintiff's WAIS-III test results showed that she had a verbal IQ of 73, a performance IQ of 74, and a full scale IQ of 71, and that she was functioning in the borderline range of intellectual ability. Her K-FAST test results showed that her functional literacy was "well below average," and that she could not explain complex cooking directions, identify acronyms, or perform division. Plaintiff, however, could perform basic addition, subtraction, and multiplication, and she could read "want ads," medication directions, and representations of door signs. Mr. Salinger also administered the Minnesota Multiphasic Personality Inventory-2, and the Millon Clinical Multiaxial Inventory Third Edition. Plaintiff's responses, however, appeared to be random, and Mr. Salinger did not score her test results. Additionally, Mr. Salinger administered the Parenting Awareness Skills Survey (PASS) and the Child Abuse Potential Inventory (CAP). Plaintiff's CAP responses appeared random and were not scored. Plaintiff's PASS results suggested that she

7

would have difficultly handling demanding children over an extended period of time.  Mr. Salinger diagnosed neglect of child, post-traumatic stress disorder (PTSD), and dysthymic disorder - provisional.  He assigned a GAF score of 51, and recommended parenting training, and psychiatric and psychotherapeutic treatment.

Slightly more than one month after her alleged onset of disability, on January 6, 2006, Plaintiff discussed her application with a State agency disability determination services ("DDS") employee over the telephone.  The employee reported that Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, or answering during the discussion. That same day, Plaintiff completed a Disability Report in connection with her application.  Although she wrote that her conditions limited her ability to work because she had difficulty tolerating people and began crying when she could not handle stress, Plaintiff reported that she continued to work after her conditions first bothered her, and that she did not need to change job duties or work fewer hours as a result.

On January 18, 2006, Plaintiff completed a Function Report in connection with her application.  She wrote that she did not want to dress, shave, or "eat half of the time," and she only wanted to bathe and care for her hair "sometimes" because of her conditions.  She also wrote that she could not prepare meals because she burned them, and that she only went outside when she "need[ed] to."  Plaintiff wrote that she could drive, sweep, clean the bathroom, and mop her house.  She reported, however, that she did not do housework because her "husband love[d] to do it." Although she wrote that she had difficulty concentrating, understanding, following instructions, and getting along with others, Plaintiff

8

wrote that she could pay bills, count change, and use a checkbook/money orders. She also wrote that she did not need to be reminded to go places, and that she could go places without being accompanied. Finally, Plaintiff wrote that her hobbies and interests were watching television and playing with her children.

On January 26, 2006, Plaintiff presented to Robert Pulcher, Ph.D., for psychological evaluation at the request of DDS. She reported poor sleep patterns, increased appetite, distressing dreams, and one attempted suicide. She also reported that she always worried about things, always felt irritable, and always felt sad and depressed. Plaintiff reported that she always started things that she did not finish, but that she was "never" forgetful and "never" had trouble with her memory. She also reported that she was "let go" from her last job at a nursing home because "she could not handle people dying when she cared for them," and that she quit her job as a certified nurse's assistant because she was not getting along with working with her aunt. Plaintiff was fully oriented to time, person, place, and situation. Although she presented with a tense affect and slightly depressed mood, her attention was good, her eye contact was variable, her speech was clear with normal intensity, rate, and inflection, and her intellect appeared within the average range. Plaintiff declined to attempt performing serial sevens backward from 100, but she could remember three items immediately and after 15 minutes, she could name the current president and current governor of Missouri, and she did not exhibit verbal or non-verbal symptoms of severe depression. Dr. Pulcher also noted that Plaintiff completed all office paperwork without difficulty. Dr. Pulcher assessed depressive disorder not otherwise specified and assigned a GAF score of

9

60. He opined that Plaintiff had symptoms of mild depression but did not report losing employment due to mental illness, and that she should be referred to vocational rehabilitation to assist her in finding a job. He also opined that she could understand and remember instructions, and sustain concentration and persistence in tasks.

On March 9, 2006, Plaintiff completed a Disability Report - Appeal. She wrote that because of her conditions, she could not "stand being around people," and that she "continue[d] to be limited" in her ability to complete her daily activities. She also wrote that she should be getting treatment and taking medication, but that she could not afford to do so.

On April 4, 2006, Plaintiff presented to Julia Bozarth, M.A., at Pathways for a treatment evaluation. She reported that she felt depressed, angry, and "stressed out," that she was hearing voices and having trouble sleeping, and that she wanted to keep her family problems "blocked out." Plaintiff's mood was dysphoric, her affect was depressed, her impulse control was poor, her psychomotor activity was retarded, and her manner was withdrawn. She also had poor insight, judgment/reason, and attention/concentration, but her orientation, memory, continuity, and energy/libido were within normal limits, and she denied suicidal thoughts. Ms. Bozarth assessed major depressive disorder and PTSD, and assigned a GAF score of 45.[3]

---

[3]A GAF score of 41 to 50 represents serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *See* DSM-IV-TR at 34.

Case 4:08-cv-00846-NKL    Document 17    Filed 09/18/09    Page 10 of 27

On May 31, 2006, Plaintiff returned to Pathways for further evaluation. She reported that she had been troubled by family, social, employment, psychological, and emotional problems in the last 30 days, and that she had been having trouble with violence control. Plaintiff's clinician wrote that she had problems with reality testing, thought disorder or paranoid thinking; comprehension, concentration, or memory; was not taking any medication; and assigned a GAF score of 50.

On June 7, 2006, Plaintiff presented to Rolf Leed, M.Div., at Pathways to begin counseling. Plaintiff reported that her anger worried her, and that when stress and negative events bothered her, she went to bed and did not get up, or "physically hit out." She also reported she did not want to be in counseling but was "forced by the juvenile authorities" to come and deal with her anger issues.

On June 21, 2006, Plaintiff returned to Mr. Leed for counseling. She reported "several [recent] loss of control events" in dealing with her anger, but that she had not resorted to violence. Mr. Leed noted that Plaintiff appeared calm, clear, and willing to discuss her problems.

On July 7, 2006, Plaintiff returned to Mr. Leed. She reported being stressed by family situations. Mr. Leed noted that Plaintiff exhibited some signs of anxiety and stress, but that she "seemed to be dealing with it," and that she was open and honest about her concerns.

During follow-up on July 20, 2006, Mr. Leed noted that Plaintiff continued to have difficulty in her personal relationships. During follow-up on August 8, 2006, Plaintiff was

11

depressed over her husband's "lack of care and affection for her," but "elated" at the return of her children from DFS custody.

On August 28, 2006, Plaintiff returned to Mr. Leed. She reported that she was frustrated with her husband's "laying around," and "not doing anything." Plaintiff appeared upset and angry, and exhibited masked signs of depression and anxiety. Mr. Leed recommended anger management, and noted that her depression was causing her overreaction.

On September 5, 2006, Plaintiff presented to Terri Rager-White, M.S./L.P.C., at Pathways for treatment evaluation. Plaintiff reported that she was having problems with anger and wanted to try medication because it had been effective in the past. Although her mood was dysphoric, her affect was depressed, and her insight, impulse control, judgment/reasoning, and attention/concentration were poor, Plaintiff's orientation, continuity, and memory were within normal limits. Ms. Rager-White wrote that Plaintiff would begin a medication regimen because Plaintiff believed it would help "calm her down."

On September 25, 2006, Plaintiff returned to Mr. Leed. Plaintiff appeared to be in a positive disposition and reported that she and her husband had just moved into a new home. Although Plaintiff had some signs of stress and depression, Mr. Leed wrote that she seemed to be handling them.

On October 1, 2006, Plaintiff completed a second Disability Report - Appeal. She wrote that because of her conditions, she did not like to "stay out in public for a long time" and she could not "comprehend stuff." She also wrote that, on September 18, 2006, she was

12

told by her "counselor" that she had explosive temper disorder. Finally, Plaintiff wrote that her condition had changed since she started taking medication.

On October 6, 2006, Plaintiff returned to Pathways for a diagnostic evaluation. She reported that she felt depressed and was having trouble sleeping. Plaintiff's appearance was sad, her intellect was below normal, and her insight and judgment were poor, but her sensorium, speech, motor activity, and flow of thought were normal. Plaintiff's clinician recommended Prozac and trazodone, and continued therapy and vocational rehabilitation.

On January 4, 2007, Plaintiff presented to Pamela Sisk, M.S., N.P., at Pathways. Plaintiff reported that her current medication was not effective at controlling her anger, and that Depakote had been effective in the past. She also requested medication to control her mood and help her sleep. Ms. Sisk prescribed Depakote and trazodone. During follow-up with Ms. Sisk on January 18, 2007, Plaintiff reported irritability and labile mood, but stated that she felt calmer and had been sleeping better since she started taking Depakote and trazodone. She also reported no side effects from her medication. Her affect was dysthymic/blunted, but Plaintiff was alert and oriented, her cognition was clear and logical, she was negative for psychosis, and she denied suicidal or homicidal ideation. Ms. Sisk continued Plaintiff's Depakote and trazodone.

On January 23, 2007, Plaintiff returned to Mr. Leed. Plaintiff appeared cheerful and reported that things were going very well at home. Although she reported that she had experienced some incident of physical temper, she reported that she was experiencing less incidents of physical temper towards her family.

13

On February 15, 2007, Plaintiff returned to Ms. Sisk. Plaintiff's cognition was slow, but she was alert, oriented, and euthymic, she had no psychosis, and she denied suicidal or homicidal ideation. Ms. Sisk continued Plaintiff's Depakote and trazodone, and noted that she had reported no side effects from her medication.

On March 13, 2007, Plaintiff returned to Mr. Leed. She reported stress caused by her husband's serving of supervised probation. Mr. Leed noted that Plaintiff appeared tired and stressed, but that "this seem[ed] to be her usual mental state." He also noted that Plaintiff lived in situations that appeared to produce depression and anxiety, but that she appeared to get through the stress.

On March 15, 2007, Plaintiff returned to Ms. Sisk. Plaintiff was alert and oriented, her affect was broad and euthymic, her cognition was clear and logical, she had no psychosis, and she denied suicidal or homicidal ideation. Ms. Sisk continued Plaintiff's trazodone and Depakote, and wrote that she was not experiencing any side effects from her medication.

On March 28, 2007, Plaintiff returned to Mr. Leed. She reported that she felt upset with her husband. Mr. Leed noted that Plaintiff's husband and one of her daughters were receiving disability, and that Plaintiff's goal appeared to have her entire family receiving disability benefits because she and her second daughter had both applied.

During follow-up on April 12, 2007, Plaintiff told Mr. Leed that she was frustrated by her husband. Mr. Leed noted that she showed some signs of anxiety and depression. On April 26, 2007, Plaintiff told Mr. Leed that she felt tired and ill with flu-like symptoms, and continued to have difficulty with symptoms of depression.

14

On May 10, 2007, Plaintiff returned to Ms. Sisk. She reported some difficulty with insomnia, but stated that she had been doing well with her mood, and that, although she felt irritable at times, she was controlling her anger and experiencing no side effects from her medication. Ms. Sisk continued Plaintiff's trazodone and Depakote, and prescribed Vistaril.

On May 15, 2007, Plaintiff returned to Mr. Leed. Plaintiff appeared depressed "but actually laughed" for the first time. Mr. Leed wrote that Plaintiff's family structure was "so distorted" that she had little chance of achieving happiness.

On June 8, 2007, Plaintiff returned to Ms. Sisk. She reported some difficulty with insomnia, but reported that she had been "doing well overall," and that her medication helped to keep her calm and make her less irritable. During follow-up with Ms. Sisk on July 6, 2007, Plaintiff reported difficulty sleeping but reported that her mood had been stable. Ms. Sisk noted that Plaintiff's IQ was low. Although her behavior was impulsive, Plaintiff was alert and oriented, her affect was broad and euthymic, she had no psychosis, and she denied suicidal or homicidal ideation. Ms. Sisk continued Plaintiff's medications.

On August 16, 2007, Plaintiff presented to Ursula Fuller, M.N., for counseling. She reported that she was "doing good" on Depakote, Abilify, and Seroquel, except that she did not feel that her Seroquel was strong enough, and that she was still having some difficulty with insomnia. Plaintiff was awake, alert, and oriented, her mood was euthymic, her affect was congruent, her speech was regular in rate, rhythm, and tone, her thought process was coherent, logical, and goal directed, and her memory, attention, concentration, and eye contact were good. Although her intelligence was borderline-average, Plaintiff had normal

15

insight, judgment, and impulse control, she had no obsessions, compulsions, delusions, and she denied any suicidal or homicidal ideation.  Ms. Fuller increased Plaintiff's Seroquel and continued her other medications.

October 17, 2007, Plaintiff returned to Ms. Fuller.  She said that she was "OK," and she believed that Depakote helped her to stay calmer.  Plaintiff was awake, alert, and oriented; her mood was euthymic; her affect was congruent; her intelligence was average; her thought process was coherent, logical, and goal directed;  her speech was regular in rate, rhythm, and volume; her judgment, insight, and impulse control were normal; and her attention, concentration, and memory were good.  Ms. Fuller increased Plaintiff's Seroquel, prescribed Depakote, and continued her trazodone.

On November 1, 2007, Plaintiff returned to Mr. Leed.  She reported that she was having a good day, and that she was more satisfied with her husband.  Although she reported that she was having difficultly with hearing voices, Mr. Leed wrote that they seemed more like the narration of some intensive thoughts.  He also noted that she was applying for disability benefits, which "seem[ed] to be a family tradition."

On November 14, 2007, Plaintiff returned to Ms. Fuller.  She reported that she was doing "OK" as long as she did not forget to take her medication, and that she felt unstable when her medication "wore off."  Plaintiff was awake, alert, and oriented; her mood was euthymic; her affect was congruent; her intelligence was average; her thought process was coherent, logical, and goal directed; her speech was regular in rate, rhythm, and volume; her judgment, insight, and impulse control were normal; and her attention, concentration, and

16

memory were good.  Ms. Fuller continued Plaintiff's medication and noted that she was not experiencing any adverse side effects.

On November 27, 2007, Plaintiff returned to Mr. Leed.  Plaintiff "seemed less beat down and depressed" because she had "heard" that she was going to begin receiving disability benefits.  During follow-up on December11, 2007, Plaintiff had some signs of anxiety and depression, and discussed the events in her life as if they had occurred in someone else's life.  Her attitude, however, was more positive.

On December 12, 2007, Plaintiff returned to Ms. Fuller.  She reported some weight gain from her medication, but said that she was otherwise doing "OK," and that her medication was working well.  Plaintiff was awake, alert, and oriented; her mood was euthymic; her affect was congruent; her intelligence was average; her thought process was coherent, logical, and goal directed; her speech was regular in rate, rhythm, and volume; her judgment, insight, and impulse control were normal; and her attention, concentration, and memory were good.  Ms. Fuller continued Plaintiff's trazodone, Depakote, and Seroquel.

During follow-up with Ms. Fuller, on February 6, 2008, Plaintiff said that she was feeling "OK,"and sleeping well.  She reported that she was hearing voices, but also told Ms. Fuller that she "smoke[d] a joint" every two or three moths to "calm down."  Plaintiff was awake, alert, and oriented; her mood was euthymic; her affect was congruent; her intelligence was average; her thought process was coherent, logical, and goal directed;  her speech was regular in rate, rhythm, and volume; her judgment, insight, and impulse control were normal; and her attention, concentration, and memory were good.  Ms. Fuller increased Plaintiff's

17

Seroquel, and continued her Depakote and trazodone. On February7, 2008, Ms. Fuller completed a treatment evaluation. She assessed bipolar I disorder, intermittent explosive disorder, and PTSD, and assigned a GAF score of 45. On February 12, 2008, Plaintiff returned to Mr. Leed. He wrote that she displayed no signs of depression or anxiety.

On March 5, 2008, Plaintiff returned to Ms. Fuller. She reported that she was upset because DFS had removed her children from her custody. Plaintiff was awake, alert, and oriented; her mood was euthymic; her affect was congruent; her intelligence was average; her thought process was coherent, logical, and goal directed; her speech was regular in rate, rhythm, and volume; her judgment, insight, and impulse control were normal; and her attention, concentration, and memory were good. Ms. Fuller wrote that Plaintiff was relatively stable on her medications and continued her Seroquel, trazodone, and Depakote.

On April 16, 2008, Plaintiff presented to David Dalby, M.S., L.C.S.W., for a parenting assessment required by DFS. She reported that she had been diagnosed with PTSD, bipolar disorder, a sleep disorder, and "stress issues" by a counselor at Pathways. She reported, however, that she had stopped going to her Pathways counselor because she and her husband had started attending "parenting counseling," and wanted to "save on gas." Plaintiff reported feeling suicidal at age 14, and that she often felt sad, unmotivated, and "blah" if she was not focusing on her children. Plaintiff was appropriately dressed and oriented, and she exhibited no overt signs of a mood disorder. She reported reading comprehension "issues" when she was a child, but Mr. Dalby wrote that she appeared to have overcome these issues or she had learned to compensate for them. Mr. Dalby administered the PASS and CAP. Based on her

18

test results, Plaintiff had some abuser-type traits, and had insufficient childcare-situation parenting analysis skills. Mr. Dalby opined that Plaintiff presented the possibility of paranoid and/or phobic thought patterns and should consider psychotherapy and anger management.

At the May 8, 2008 hearing, Plaintiff testified that she lived at home with her husband and two daughters, ages six and seven. She also testified that she regained full custody of her children in 2005, but that she was required to attend counseling by DFS. Plaintiff testified that she was a high school graduate, had been enrolled in special education classes from kindergarten through twelfth grade, and had reading comprehension problems. She testified that her education was not equivalent to that of a student who had not been enrolled in special education because "watching TV and coloring" was not equivalent to the regular curriculum. Plaintiff testified that she had been diagnosed with PTSD caused by sexual abuse when she was a child. She also testified that she had been diagnosed with depression, and that "flashbacks" caused her to feel depressed. Plaintiff testified that she was "sometimes" able to control her anger with medication, and that her doctors were in the process of evaluating her medication. She also testified that she had no problem dealing with her children's teachers. Plaintiff testified that she had previously worked as a waitress, cashier, and nursing home assistant for one month each, and as a certified medication assistant for less than two months. She testified, however, that she was "fired" from her job as a certified medication assistant because she lost her temper with her boss, who was also her aunt. Plaintiff testified that she could drive, and that she regularly drove to her doctors

19

appointments and her counseling appointments every two weeks. She also testified that she spent her day cleaning, going to the grocery store, and "hang[ing] out with [her] mom." Plaintiff testified that her husband and one of her daughters received disability benefits, and that she received money from the Temporary Assistance for Needy Families program. Finally, she testified that she and her husband were current on their bills.

The ALJ then heard testimony from a vocational expert ("VE"). The ALJ asked the VE whether Plaintiff could engage in work in the national economy if the ALJ found that she had severe mental retardation and other mental impairments precluding even simple, repetitive tasks; the VE responded that Plaintiff could not. The ALJ then asked the VE to consider whether she could engage in work in the national economy if he found that she had the degree of depression that she could calculate change, pay bills, and read basic directions and safety notices, and was limited to simple, repetitive tasks, and unskilled work with limited interaction with the public and co-employees. The vocational expert testified that she could hypothetically work as an assembler (300 greater Joplin area jobs; 2,700 Missouri jobs; 103,000 national jobs), packager (700 greater Joplin area jobs; 4,300 Missouri jobs; 211,000 national jobs), and inspector (400 greater Joplin area jobs; 2,600 Missouri jobs; 143,000 national jobs).

## A.    The ALJ's Decision

Plaintiff claimed only mental disabilities. In his June 16, 2008, written decision, the ALJ set forth the requisite five-step process for making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir.2003)

(describing the five-step process). Applying that process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 29, 2005. He found that she had the following severe impairments: organic mental disorder, depression and chronic brain syndrome, but that these impairments did not meet or equal the listed impairments. The ALJ found that Plaintiff: was mildly restricted in activities of daily living, and had moderate difficulties in social functioning, concentration, persistence or pace. The ALJ then turned to assessing Plaintiff's Residual Functional Capacity ("RFC") under the detailed assessment required in cases of adult mental disorders.

Considering the evidence of record, the ALJ determined that Plaintiff's medically determined impairments could produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of those symptoms were not fully credible. He noted that, although Plaintiff testified she cannot work, she functions well enough to serve as the designated payee for her husband and daughter's Supplemental Security Income disability benefits. He also noted that her daily activities included caring for her two young girls, ages six and seven, as well as shopping, housekeeping, paying bills, managing bank accounts and driving. He considered the results of the WAISS-III test, showing scores in the low 70s. The ALJ stated that Plaintiff had said she was feeling better since her medication changes, and that Dr. Pulcher indicated she would return to work. The ALJ considered that Plaintiff had no psychiatric hospitalizations, as well as the state agency assessment of Plaintiff. The ALJ stated that the evidence did not establish a physical or mental impairment which would preclude sustained light work. The ALJ found that Plaintiff

21

had the RFC to perform the full range of light work, but that she would be limited to simple, repetitive tasks and had to avoid contact with co-workers and the public.

The ALJ then considered the VE's testimony. The ALJ then found that, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff had been capable of successfully adjusting to work that exists in significant numbers in the national economy. Ultimately, the ALJ determined that Plaintiff was not disabled.

## II.    Discussion

Plaintiff appears to take issue only with the ALJ's decision regarding her RFC. She seems to claim that the ALJ failed to properly consider her nonextertional limitations in determining her RFC; and she argues that the ALJ continued this error in failing to ask the VE proper hypothetical questions incorporating a proper RFC assessment.

To establish that she is entitled to benefits, Plaintiff must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A). The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Plaintiff does not have a disability entitling her to benefits. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id.* (citations omitted). The Court must defer "heavily" to the findings and conclusions of the ALJ. *See Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). The Court will uphold the denial of benefits so long as the ALJ's

decision falls within the available "zone of choice." *See Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008). "The decision of the ALJ is not outside the zone of choice simply because [a reviewing court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quotation omitted).

## A. The ALJ Properly Determined Plaintiff's RFC

RFC is a "function-by-function assessment of an individual's ability to do work-related activities based upon all of the relevant evidence." *Harris v. Barnhart*, 356 F.3d 926, 929 (8th Cir. 2004). RFC is the most an individual can do despite the combined effect of all credible limitations. 20 C.F.R. § 416.945. *See also Pearsall*, 274 F.3d at 1217 (clarifying that the claimant has the burden of showing an inability to work). In assessing RFC, an ALJ need only include limitations that he or she finds credible. *See Pearsall*, 274 F.3d at 1218 (*citing Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)). The ALJ's RFC determination must be based on some medical evidence, and he or she is not able to substitute his or her own opinion. *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005). Still, the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Id.* (internal quotation omitted).

Plaintiff argues that the ALJ "skipped" considering her mental impairments in assessing her RFC. Without citing facts in evidence, she argues that her mental impairments cause significant restrictions on her ability to work. Thus, she argues that the ALJ should have found her disabled.

Contrary to Plaintiff's argument, the ALJ's decision is concerned almost exclusively with her mental impairments, the only impairments she alleged to be disabling. He found that she had severe mental impairments – specifically, organic mental disorder, depression and chronic brain syndrome. He considered the evidence concerning these impairments and found her limited to simple, repetitive tasks. The ALJ did not "skip" consideration of Plaintiff's mental impairments and found that those impairments were severe.

The objective medical evidence supports the finding that Plaintiff's impairments do not prevent Plaintiff from working with certain restrictions. Current testing showed that Plaintiff had IQ scores in the low 70s. Though Plaintiff's prior scores from ages 6, 12, and 15 indicate lower scores, those scores are no longer considered current under the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D10 (stating that IQ test results, when 40 or above, are considered current for two years when obtained from children between 7 and 16 years of age). Despite her mental impairments, Plaintiff was able to earn her temporary certified medication assistant license. Several clinicians found Plaintiff to be alert, oriented, appropriately dressed, coherent, goal-directed, appropriately behaved in therapy, with memory and intelligence within normal range – even after her alleged onset date. Also after her alleged onset date, Dr. Pulcher opined that she could understand and remember directions and sustain concentration and persistence in tasks; he opined that she should be referred to vocational rehabilitation to help her find a job. Although Plaintiff's personal life presented stress, Mr. Leed repeatedly noted that she seemed to be dealing with the stress in her life and

24

his notes indicate improvement. Plaintiff points to no medical opinion indicating that her impairments are so severe that she cannot work.

The ALJ also considered third-party reports indicating that Plaintiff's limitations were not as severe as she alleged. *See* 20 C.F.R. § 416.929(a). During the relevant time period, third parties reported she had no difficulty understanding conversational speech, evaluation materials, completing paperwork, or with reading comprehension.

Plaintiff's daily life activities are also inconsistent with her allegations of limitations. The record shows that she can drive, do household chores, pay bills, handle money matters, care for her children, shop, and spend time with family. *See generally Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2007) (noting that daily life activities of cooking, cleaning, doing laundry and exercising were inconsistent with finding of disability where no physician examining claimant had opined that she was disabled).

The ALJ properly considered the record evidence. His RFC finding is supported by substantial evidence.

### B. The ALJ Properly Determined Plaintiff's Ability to Perform Jobs Available in the National Economy

The ALJ was entitled to rely on the VE in determining that Plaintiff could perform jobs existing in significant numbers in the economy. *See Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) (stating that ALJ was entitled to rely on response of vocational expert to properly-formulated hypothetical question). Plaintiff argues that the ALJ's finding based on the VE's testimony is not supported by substantial evidence because the ALJ's

question failed to inform the VE that some of her limitations stemmed from borderline intellectual functioning. First, though the ALJ did not use the term "borderline intellectual functioning," his questioning did inform the VE of a finding that Plaintiff was severely mentally retarded, but not so as to foreclose her ability to perform simple, repetitive tasks. The ALJ called for consideration of a claimant of Plaintiff's age, education, and work experience, who had the ability to calculate change, pay bills, and read basic directions and safety notices, and who was limited to simple, repetitive tasks, and unskilled work with limited interaction with the public and co-employees. The ALJ's hypothetical properly encompassed the "concrete consequences" of the impairments he found credible. *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 1009) ("the hypothetical question need not frame the claimant's impairments in the specific diagnostic terms used in medical reports, but instead should capture the 'concrete consequences' of those impairments") (citation omitted); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("describing [a claimant] as capable of doing simple work adequately accounts for the finding of borderline intellectual functioning").

The ALJ's hypothetical questions to the VE were based on his RFC finding, including those limitations he appropriately found credible. "Because the vocational expert was presented with a proper hypothetical, [his] testimony that there were significant numbers of jobs that [Plaintiff] could perform despite [her] limitations constitutes substantial evidence supporting the ALJ's determination that [Plaintiff] was not disabled." *Id.* (citation omitted).

Case 4:08-cv-00846-NKL   Document 17   Filed 09/18/09   Page 26 of 27

**III.    Conclusion**

The ALJ's decision is supported by substantial evidence.  Accordingly, it is hereby

ORDERED that Plaintiff's petition [Doc. # 5] is DENIED.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge
Dated:  September 18, 2009
Jefferson City, Missouri